CURTISS *v.* HURD.

*(Circuit Court, S. D. New York.* May 9, 1887.)

1. SALE—RESCISSION—MISREPRESENTATION.
    Equity will rescind a purchase, upon the application of the purchaser, where the purchase was induced by a material misrepresentation of the vendor, although the misrepresentation were innocently made by the vendor.
2. SAME—MATERIALITY.
    Such relief will not be granted, however, if the misrepresentation was of a trifling or immaterial thing, or if it was vague and inconclusive in its nature, or if the complainant did not trust to it, or was not misled by it, or if it was upon matter of opinion, or was of a fact equally open to the knowledge of both parties, and in regard to which neither could be presumed to trust the other.
3. SAME—CORPORATE EXISTENCE.
    Upon a purchase of shares of stock in an association, which was in legal effect merely a partnership, the vendor represented that the association was an incorporated company. *Held,* that such a representation, although untrue in fact, was not a misrepresentation of matters of substance, in the absence of any inquiries on the part of the purchaser concerning the character of the corporation, and was not a sufficient ground for decreeing a rescission of the purchase.[1]

In Equity.

*G. Zabriskie,* for complainant.

*L. B. Bunnell,* for defendant.

WALLACE, J. Complainant sues to obtain a rescission of a purchase of 100 shares of stock in the Housatonic Rolling-Stock Company, bought by him in August, 1882, and for which he paid the sum of $4,250, alleging that he was induced to make the purchase by the misrepresentations of the defendant, who was the president of the company. The bill alleges that various misrepresentations were made to the complainant by the defendant which were the inducing cause of the purchase of the stock. The proofs, however, are such that it is only necessary to consider whether there was such a misrepresentation respecting the corporate organization of the Housatonic Rolling-Stock Company as entitles him to the relief sought. The Housatonic Rolling-Stock Company was not an incorporated company. It was an association which was in legal effect a partnership, formed by the defendant and several others in October, 1881, for the purpose of buying, building, leasing, and running railroad cars under the name and style of the Housatonic Rolling-Stock Company. By the articles of association the legal title to the property was vested in a board of trustees (who were named) and their successors, who were to have the sole custody and management of the business and property of the association, with power to appoint its officers. The amount of capital to be contributed was not fixed by the articles of association, although the capital stock was divided into shares, and each

---

[1] Respecting the fraud for which equity will give relief, see Dillman v. Nadlehoffer, (Ill.) 7 N. E. Rep. 92.

associate subscribed for a specified number of shares. The capital was represented by cars. From time to time the defendant delivered cars to the company, and thereupon scrip for shares, as an equivalent, was issued by the company. At the time the complainant became a stockholder the company owned 1,644 cars, and had issued scrip for 27,440 shares, of the nominal value of $100 each. The articles of association made acceptance of a certificate of shares conclusive evidence of the assent of the holder to all the provisions of the articles. They provided for regular meetings of the shareholders, but gave the shareholders no right to vote without the consent of the trustees. In short, the company was an association of individuals organized in the form and with the ordinary machinery of a corporation; but it was not a corporation, because no attempt was made to comply with the laws of the state of Michigan, where the association was organized, in respect to the formation of corporations. The conditions of the association made the trustees a self-appointing body, gave them unlimited powers, and placed the shareholders at their mercy.

The proofs show that the complainant was led by the statements of one Trubee, a friend of his, to suppose that an investment in the stock of the company would be very remunerative, because other rolling-stock companies which had been organized and managed by the defendant had been so, and that handsome dividends could be expected upon stock which could be obtained for not far from 40 cents on the dollar. Soon afterwards complainant was taken by Trubee to the office of the defendant, and introduced by Trubee to the defendant as a person who wanted information about the company. The defendant understood that the complainant might become a purchaser of some stock. At the interview which then took place, there was considerable conversation about rolling-stock companies in general, and how they had paid large returns upon capital invested, and could do business with very little risk of loss. Speaking of the present company, the defendant stated it was well under way, and that most of the cars were rented; that the prospects of the company were good; that a similar company organized by him previously had paid 70 per cent. in three years; that he was the president of a number of rolling-stock companies; that he thought this was really the best that he had ever had anything to do with; that the stockholders of the other companies had always been satisfied; that he thought the stockholders of this one would be; and that the company had already earned dividends, one of which would be paid in a short time. The complainant asked the defendant how it was that the company could put out its stock at 40 cents on the dollar, and the defendant said it could do so because it was organized under the laws of Michigan. A few days after this interview the complainant wrote Trubee to ascertain the price at which the stock could be purchased, and Trubee informed him in reply that it could be bought for 42½ cents on the dollar. Thereupon complainant instructed Trubee to buy 100 shares, and sent him his check for the amount. In fact, Trubee bought the stock of the defendant for 40 cents on the dollar, and kept $250 of the proceeds of complainant's

check for himself. The defendant had a certificate prepared for the complainant, and delivered it to Trubee, who sent it to the complainant. This certificate recited that complainant was entitled to " one hundred shares, of $100 each, of full-paid stock, in the association called the Housatonic Rolling-Stock Company, transferable only on the books of the association, in person or by attorney, in accordance with the articles, by-laws, and regulations." It contained also this recital: "The holder of each share, when transferred as above provided, is subject to all the liabilities and provisions, and is entitled to all the privileges, of a member, as fully as if he had signed the original articles of association."

The complainant first learned that the company was not incorporated under the laws of Michigan in the fall of 1884. Soon thereafter he tendered to the defendant an assignment of the scrip, with the dividends he had received upon the stock, and brought this suit. The proofs do not show any intent to deceive or defraud on the part of the defendant. He had some of the stock to dispose of, and doubtless presented the prospects of the company in as attractive an aspect as he fairly could; but he did not hold out any special inducements to the complainant to buy, and made no misrepresentation about the financial condition of the company. He was not asked any question calling for specific information about the amount or value of the property, or about the expenses or income of the company; nor was he asked any question about the character of the organization, or the rights or liabilities of shareholders. The company was upon a prosperous footing at the time, and there is nothing to show that the statements made by him about its condition and prospects were not warranted by the facts. When he transferred the stock he did not know that Trubee had represented to the complainant that the price was $4,250, nor did he know what price the complainant paid Trubee for it, although Trubee, to excuse his own conduct, testifies to the contrary. He knew that the stock was going to the complainant, but did not concern himself with any inquiry whether Trubee was buying it as agent for the complainant, or for himself as a vendor to the complainant. This view of the facts has not been influenced by the testimony of the defendant himself, which, so far from strengthening his own case, has only tended to prejudice it.

It is apparent from the complainant's own narrative that he was led to buy the stock because he believed that rolling-stock companies generally had been profitable, and therefore that this one was likely to be, rather than because he relied upon any special facts respecting the company stated by the defendant. He is probably mistaken in asserting that the defendant told him that the capital stock of the company was $1,000,000, or anything to that effect. His impression upon this point is probably derived from the recital in his certificate of the amount of capital stock. He admits that about two months after he made the purchase he met the defendant, and was then informed by him that the company issued stock as cars were " put in," and that his stock represented cars put in at the time he bought it of defendant. About a year after the purchase he was again fully informed by the defendant of the manner in which

the trustees of the company were accustomed to issue stock for cars from time to time. He made no charge of misrepresentation when he received these explanations, and it is improbable that he would not have done so, or that he would have taken no steps to rescind his purchase, if what was thus stated had been a surprise to him. At the time of the purchase, he believed that the stock would yield dividends of 6 per cent., and consequently that an investment in it would return about 14 per cent. He was allured by his expectations into making an investment without any adequate investigation or inquiry respecting the conditions and chances. But he undoubtedly did suppose that the company was an ordinary corporation or joint-stock company, organized under the laws of Michigan. The name by which it was styled, and the conversation with the defendant about capital stock, shareholders, and dividends, naturally suggested this. So did the certificate which he received. A more vicious scheme of association, or a more loose and lawless system of administration, than was adopted by the promoters and managers of this company for administering its affairs, can hardly be conceived. It is difficult to believe that they could have induced any person outside their own circle, who was informed of the powers intrusted to them and of the business methods of the company, to invest his money in the shares. Slight evidence of corrupt administration would suffice to create the belief that the scheme was intended as a fraud at its inception. But the proofs are destitute of any evidence to show that the interests of the shareholders were subordinated to those of the managers. On the contrary, the proofs show that the affairs of the company were honestly managed, and, had it not been for circumstances beyond the control of the managers, there is no reason to doubt that the shareholders would have continued to receive large dividends upon their investments. A report of a committee of stockholders, made after an examination of the affairs of the company in June, 1885, has been introduced in evidence by the complainant, which shows that the powers conferred by the articles of association upon the trustees had not been abused, and that the intermission of dividends was mainly caused by the failure to collect moneys due from the railroad companies which were suffering from the general depression of railroad business.

These facts do not furnish an adequate basis for a rescission of the complainant's purchase. A purchaser cannot expect a court of equity to decree him a rescission merely because he is able to show that his purchase has not turned out to be what he supposed he was buying. He must rely upon proof of deceit or misrepresentation on the part of the vendor, or upon a case of mutual mistake going to the essence of the contract. Any right to relief in the present case must rest upon the ground that the complainant has been misled by the fraudulent suppression or the misrepresentation by the defendant of some matter of substance. As has been said, there was no intent to deceive or mislead on the part of the defendant. If there were any misrepresentation, it is to be found in his statements respecting the corporate character of the company,—vague and incidental statements, which are also contained in the certificate of shares

received by the complainant. If these statements furnish adequate ground for a rescission, every purchaser of stock in the company who may have bought without making inquiry, or without special information about the terms and conditions of the articles of association, may also insist upon a rescission.

If the defendant has made a material misrepresentation, the complainant is not to be precluded from relief merely because the defendant did not intend to defraud. In such cases courts of equity will relieve the purchaser, although the misrepresentations were innocently made by the vendor. *Smith* v. *Reese River Co.*, L. R. 2 Eq. 264; *Kennedy* v. *Panama Co.*, L. R. 2 Q. B. 580; *Peek* v. *Gurney*, L. R. 13 Eq. 79, 113. A vendor cannot be heard to say that he knew nothing of the truth or falsehood of that which he has represented, and claim to retain any benefit derived from the sale when the representations turn out to be untrue. TURNER, L. J., in *Rawlins* v. *Wickham*, 3 De Gex & J. 304, 317.

On the other hand, if the misrepresentation was of a trifling or immaterial thing, or if it was vague and inconclusive in its nature, or if the complainant did not trust to it, or was not misled by it, or if it was upon matter of opinion, or of a fact equally open to the inquiries of both parties, and in regard to which neither could be presumed to trust the other, a court of equity will not interfere.

Looking at the case in the most favorable aspect possible for the complainant, and treating it as one where he was induced to purchase the stock upon the defendant's representation that the company was an incorporated company organized under the laws of Michigan, it must be held that the complainant is without remedy. Such a representation, without more, is not of a matter of substance. It is too colorless and indefinite to be the foundation of a cause of action. The fact that a business concern is incorporated is of little moment, unless the charter or the organic law confers some valuable privileges or immunities upon the members. A trading association may be but a mere partnership; or it may have corporate powers to a small extent, and *sub modo;* or it may be invested with corporate functions to a considerable and yet limited extent; or it may exist with all the incidental functions and peculiar privileges which a grant of unconditional corporate power confers. There are and have been many joint-stock associations of different kinds, including banking companies, which have never been legally incorporated, and which are mere partnerships as to every person except their own stockholders. One, if not the principal, inducement which leads such companies to seek corporate organization is to limit the risk of the partners, and to render definite the extent of their hazard. But there are many corporations in which, by the organic law, the members are liable for the debts to the same extent as the members of an ordinary partnership. In some there is a limited joint and several liability to the extent of the par value of the stock of each shareholder, and in others a personal liability for such sum as the proportion of each to the whole outstanding stock bears to the outstanding debts of the corporation. See Thomp. Liab. Stockh. § 45. Where there is not a limited liability

of the members, or unless the corporation is one which is invested by the state with special privileges, incorporation is only valuable as a mode of organization which may conduce to the convenience of business management. Such are the facilities afforded by the laws of most of our states that the privileges of corporate organization are within the reach of almost any business concern, and can be obtained as a matter of course for a trifling outlay. It follows that a representation that an association is incorporated, without more, is no more than saying that it has been authorized by legislative authority to do what it could do practically, and what an infinite variety of associations are doing without such authority. It is true that, as a general rule, the shareholder of a corporation is not held to the liabilities of a member of an ordinary partnership for the debts of the concern, and a purchaser of shares does not expect to incur such a liability as a consequence of his purchase. But it cannot be affirmed that a purchaser of shares who buys without inquiry as to the character of the corporation of which he proposes to become a member, or as to the nature of the liability of the stockholders, has any legal right to complain, if he finds, after he has purchased, that the stockholders are liable for all the debts of the concern. No authority for such a proposition has been cited by counsel. If it can be maintained, it can only be done by importing an implied warranty against such a liability into every sale of shares in a corporation. No such exception to the rule of *caveat emptor* is known to the law.

Having reached the conclusion that there is no ground for the relief sought by the complainant, because there was no deceit or misrepresentation as to any matter of substance by which he was induced to purchase the stock, it is not necessary to consider whether he acted with sufficient promptitude in attempting to rescind, or whether upon other grounds his case is such as to preclude belief.

The bill is dismissed.